SHARRON WILLIAMS, APPELLANT, v.
HERBERT WALDMAN, RESPONDENT.

No. 20799

July 13, 1992                                    836 P.2d 614

---

[6]The Honorable Archie E. Blake, Judge of the Third Judicial District Court, was designated by the Governor to sit in place of THE HONORABLE JOHN C. MOWBRAY, Chief Justice. Nev. Const., art. 6, § 4.

*John Peter Lee, Ltd.,* and *Daniel Marks,* Las Vegas, for Appellant.

*Oshins & Gibbons,* Las Vegas, for Respondent.

## OPINION

*Per Curiam:*

### The Facts

Sharron Williams, appellant, and Herbert Waldman, respondent, were originally married on March 17, 1962. The couple divorced in 1965 during the time Herbert attended law school, then remarried in 1967. Sharron states that she dropped out of college in order to maintain the couple's finances during Herbert's law school enrollment. Herbert formally entered the practice of law in September 1967, and became an associate in a private law firm. In 1974, Herbert became a partner and shareholder in his firm. A decree of divorce was entered on October 19, 1980.

At the time of the divorce, Herbert owned one-third of the stock of the professional corporation, which he maintained until he left the law firm in 1989. No mention is made in the final decree of the partition of Herbert's law practice, a primary asset of the marriage.

During the course of the marriage, Sharron worked periodically at a variety of part-time jobs. At the time of the divorce, she and her husband were involved in building and selling houses. Herbert testified, however, that Sharron "was generally at home" during the course of their marriage.

Sharron and Herbert discussed divorce periodically in the year preceding the final decree. When they entered into a final decision to end their marriage, Sharron testified that she discussed finding her own lawyer. She also stated that Herbert suggested that they save themselves the expense, and that he offered to draft the agreement. Further, Sharron testified that she relied on Herbert because he was an attorney and that he had stated he would be fair to her and their three children.[1]

Herbert drafted all of the divorce papers and showed them to Sharron, who signed them without consulting an attorney. Herbert concedes that he did not propose to her that the agreement be reviewed by independent counsel. Herbert told her that the agreement was fair and structured in a way which would save her considerable taxes. Sharron signed the property settlement agreement, as well as an answer in proper person. Herbert appeared alone in court. A decree of divorce was entered one week after the parties' final decision to end the marriage. The property settlement agreement was merged into the divorce decree.

In 1987, Sharron contacted a lawyer for the purpose of seeking an increase in child support. Sharron's attorney reviewed the property settlement for legal background and subsequently asked Sharron about the division of her former husband's law practice. According to Sharron's testimony, this was the first time that she became aware that Herbert's law practice was community property, divisible upon divorce, with a monetary value which inured to her individual benefit. Herbert argued strenuously below that Sharron had specifically stated during various discussions that she was not interested in her community share of Herbert's law

---

[1]Sharron testified that her lawyer-husband responded to her suggestion that she obtain her own attorney by saying: "It doesn't make sense to waste the money. We want a civilized divorce, we don't want to fight. You know I will be fair to you and the children. You know you can trust me. I've always taken care of you, and I will." There is no basis in the record for concluding that Herbert's statement was less than sincere. However, it did place him in a situation which could make it difficult to view both sides with professional detachment and objectivity in the long term.

firm stock. Herbert maintained that Sharron received her community interest in the law firm pension plan in lieu of her community interest in the value of Herbert's share of his firm's stock. Herbert further contended that it was inevitably apparent to Sharron that Herbert had a stock ownership interest in the firm since Herbert's name appeared on the firm's letterhead, office facilities and in the phone book. Herbert testified that the omission of the law firm stock interest from the property settlement "was an oversight." Moreover, Herbert insisted that Sharron contractually agreed to release her equitable interest in the stock pursuant to paragraph 3 of the property settlement agreement. Paragraph 3 states:

> It is further agreed that all of the property now owned or held by the respective parties hereto, or that may be hereafter acquired by purchase, descent, or otherwise, and all accumulations or profits therefrom, and all earnings of either party hereto, are and shall be the separate property of that party and not the community property of the parties hereto and that neither of the parties hereto has, or at any time shall have, any right, title, interest, or claim, or has or will assert any claim of any nature whatsoever in or to the property of the other.[2]

Herbert conceded below that he had a greater and a more sophisticated knowledge of community property legal principles than his former wife. He also indicated that he failed to apprise Sharron that his interest in the law firm was a community asset with a potential monetary value judicially divisible upon divorce.

The district court found Sharron to be an intelligent and articulate woman with business experience. The judge stated: "It was clear from listening to Mr. Waldman that she stated to him that she wanted nothing to do with the practice. The practice was his." The court compared Sharron's position to "Monday-morning quarterbacking . . . divorce parties' remorse that she didn't get more," and found that Sharron had failed to prove by a preponderance of the evidence that the law practice was not divided upon divorce.

## Discussion

To the extent that a professional practice is developed over the

---

[2]Herbert testified that he did not personally "sit and discuss with her each and every word or paragraph . . . ." The legal effect of paragraph 3 was not explained. Herbert testified that "if she had any questions, she would have asked me. She had no questions. She read the document. She read it a number of times."

course of a marriage, the practice may properly be considered community property. *See* Ford v. Ford, 105 Nev. 672, 674-75, 782 P.2d 1304, 1306 (1989). The goodwill developed in a professional practice during marriage is also included in the community property estate and the value thereof is subject to division at divorce. *Id.* at 679, 782 P.2d at 1309.

In reviewing divorce proceedings on appeal, this court has generally upheld district courts' rulings that were supported by substantial evidence and were otherwise free of a plainly appearing abuse of discretion. *See* Buchanan v. Buchanan, 90 Nev. 209, 216, 523 P.2d 1, 5 (1974). "Where a trial court, sitting without a jury, has made a determination upon the basis of conflicting evidence, that determination should not be disturbed on appeal if it is supported by substantial evidence." Lubbe v. Barba, 91 Nev. 596, 600, 540 P.2d 115, 118 (1975); Fletcher v. Fletcher, 89 Nev. 540, 542, 516 P.2d 103, 104 (1973). However, in reaching a determination, the district court must apply the correct legal standard. *Lubbe,* 91 Nev. at 600, 540 P.2d at 118. We conclude that the district court failed to recognize the parties' agreement as the product of an attorney-client relationship.

The creation of an attorney-client relationship is not precluded by the mere fact of a legally close or blood relationship. *See* Nicholson v. Shockey, 64 S.E.2d 813, 817 (Va.Ct.App. 1951). Formality is not a necessary element in the creation of such a relationship, and the relationship may exist even though the attorney renders his or her services gratuitously. *See* 7A C.J.S. *Attorney & Client* § 169 (1980 & Supp. 1991) (citing cases).

An attorney-client relationship necessarily gives rise to a fiduciary relationship between an attorney and client, and all transactions growing out of such a relationship or subject to the closest scrutiny by the courts.[3] Durr v. Beatty, 491 N.E.2d 902, 906 (Ill.App.Ct. 1986). We have also held that when an attorney enters into a business relationship with a client which is, by its terms, potentially advantageous to the lawyer, this court will closely scrutinize such a transaction on appeal. *See* Davidson v. Streeter, 68 Nev. 427, 440-41, 234 P.2d 793, 799 (1951); Moore

---

[3]Herbert argues that the legal relationship at issue was more akin to persons who utilize a divorce kit in order to familiarize themselves with court procedure. We note, however, that when advice is given by an attorney, the attorney-client relationship may be established through proof of detrimental reliance. 7A C.J.S. *Attorney & Client* § 169 n.18(2) (1980 & Supp. 1991).

v. Rochester W. M. Co., 42 Nev. 164, 176, 174 P. 1017, 1020-21 (1918). A fiduciary relationship also arises from the existence of the marriage itself, thus precipitating a duty to disclose pertinent assets and factors relating to those assets.[4] *See* In re Marriage of Coffin, 63 Cal.App.3d 139, 151-52 (Cal.Ct.App. 1976).

Under our case law, when an attorney deals with a client for the former's benefit, the attorney must demonstrate by a higher standard of clear and satisfactory evidence that the transaction was fundamentally fair and free of professional overreaching. *Davidson,* 68 Nev. at 440, 234 P.2d at 799; *Moore,* 42 Nev. at 176, 174 P. at 1021. Moreover, this relationship imposes a duty of full as well as fair disclosure. *See Durr,* 491 N.E.2d at 907; Goldman v. Kane, 329 N.E.2d 770, 773 (Mass.Ct.App. 1975).

As a general proposition, lawyer-client agreements are necessarily subject to greater scrutiny and stricter rules than transactions occurring between parties on an equal footing. *See* Briggs v. Clinton County Bank & Trust Co. of Frankfort, Ind., 452 N.E.2d 989, 1004 (Ind.Ct.App. 1983). Public policy dictates that:

> When an attorney bargains with his client in a business transaction in a manner which is advantageous to himself, and if that transaction is later called into question, the court will subject it to close scrutiny. In such a case, the attorney has the burden of showing that the transaction "was in all respects fairly and equitably conducted; that he fully and faithfully discharged all his duties to his client, not only by refraining from any misrepresentation or concealment of any material fact, but by active diligence to see that his client was fully informed of the nature and effect of the transaction proposed and of his own rights and interests in the subject matter involved, and by seeing to it that his client either has independent advice in the matter or else receives from the

---

[4]In Applebaum v. Applebaum, 93 Nev. 382, 566 P.2d 85 (1977), we stated in dictum that once a spouse announces an intention to seek a divorce, the other spouse is on notice that their interests are adverse. *Id.* at 384-85, 566 P.2d at 87. The issue of whether a confidential relationship survives an announcement of an intention to seek a divorce necessarily depends on the circumstances of each case. In *Applebaum,* the marriage was of brief duration and without children. *Id.* at 383, 566 P.2d at 86. The wife was advised by her husband to retain her own lawyer and told that he would pay the expense. *Id.* at 385, 566 P.2d at 87. In the instant case, the drafter and spouse was an attorney. Moreover, the law practice was an asset peculiarly within his management and control. We also note that Herbert and Sharron had a longstanding marital partnership with three young children at the time of the divorce.

attorney such advice as the latter would have been expected to give had the transaction been one between his client and a stranger.''

*Goldman,* 329 N.E.2d at 773 (citations omitted).

Furthermore, it is a well settled rule that ''[i]n cases of doubt or ambiguity, a contract must be construed most strongly against the party who prepared it, and favorably to a party who had no voice in the selection of its language.'' Jacobson v. Sassower, 489 N.E.2d 1283, 1284 (N.Y. 1985). Since the divorce agreement was prepared by Herbert, he must ultimately bear the responsibility for deficiencies or ambiguities. *See* E.F. Hutton Group, Inc. v. U.S. Postal Service, 723 F.Supp. 951, 960 (S.D.N.Y. 1989).

We note from Herbert's sworn admissions of record that Sharron was not fully informed of all material facts relating to the value and character of Herbert's stock ownership in his law practice. Herbert has failed to demonstrate that Sharron completely understood her property rights when she executed the agreement. Through his own testimony, Herbert has not established, for example, that Sharron entered into the agreement drafted by her attorney-husband ''with such a full understanding of the nature and extent of . . . [her] rights as to enable [her] to thoroughly comprehend the scope and effect of it.''[5] Tidball v. Hetrick, 363 N.W.2d 414, 417 (S.D. 1985).

Nowhere in the property settlement agreement at issue here is Herbert's law practice and stock interest specifically mentioned or divided. We therefore conclude that the agreement must be construed against the attorney who drafted it and who was responsible for providing clarity in all of its terms. Matter of Kerlinsky, 546 N.E.2d 150, 153 (Mass. 1989). Accordingly, we determine that Sharron is entitled to show that the division of Herbert's law practice was not provided for in the parties' settlement agreement.

---

[5]Although Herbert testified that Sharron disclaimed any interest in his law practice, such testimony is unavailing where, from Herbert's record testimony, it clearly appears that Sharron's alleged statement was made in an informational vacuum, without a full understanding of the rights she was relinquishing. We are also unpersuaded from the record that Sharron's awareness of Herbert's profit sharing plan, his interest in the partnership, and his leadership role in the law firm, necessarily translates into a more sophisticated understanding of Herbert's stock ownership in the firm, the potential division of its value, and other ramifications under community property principles.

Unadjudicated property may be subject to partition in an independent action in equity. Amie v. Amie, 106 Nev. 541, 543, 796 P.2d 233, 235 (1990). Property not disposed of in a divorce action is held by the parties as tenants in common. *Id.;* Bank v. Wolff, 66 Nev. 51, 55, 202 P.2d 878, 880 (1949). We have determined, after a careful review of the record, that under the circumstances of this case, where Sharron did not have independent representation, she did not have a fair opportunity to present this issue to the original divorce court. *See* McCarroll v. McCarroll, 96 Nev. 455, 456, 611 P.2d 205, 205 (1980). Upon remand, Sharron is not required to prove that Herbert's law practice was fraudulently omitted from the property settlement, but simply that the community property at issue was left unadjudicated and was not disposed of in the divorce. *Amie,* 106 Nev. at 542, 796 P.2d at 234.

For the reasons specified above, the judgement entered below is reversed and the matter is remanded to the district court for further proceedings consistent with this opinion.[6]

MOWBRAY, C. J., ROSE, STEFFEN and YOUNG, JJ., and BREEN, D. J.,[7] concur.

---

[6]Sharron's and Herbert's positions differ markedly as to the value of the law practice. We provide no inferences concerning the subject and leave for the district court's determination, upon the taking of additional evidence, whether the value of Sharron's community interest in Herbert's stock ownership in the law firm was fairly considered and included in the property settlement agreement, in light of the attorney-client relationship which existed between the parties.

[7]The Honorable Peter I. Breen, Judge of the Second Judicial District Court, was designated by the Governor to sit in the place of THE HONORABLE CHARLES E. SPRINGER, Justice. Nev. Const., art. 6, § 4.